IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:24CR33 |
| | ) | |
| ZHANE TAVERN ELAMIN, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POSITION ON SENTENCING**

Zhane Tavern Elamin**,** by counsel, offers his position with respect to the sentencing factors. Mr. Elamin has no objections to the presentence report ("PSR").

Mr. Elamin requests that this Court impose the mandatory-minimum sentence of ten years' imprisonment by agreement of the parties pursuant to Criminal Rule 11(c)(1)(B).

**Overview of Sentencing Request**

Mr. Elamin needs counseling, supervision, and treatment. To that end, he respectfully requests that this Honorable Court impose a sentence of 120 months of incarceration. A ten-year term of imprisonment will accomplish the purposes set forth in 18 U.S.C. § 3553(a) without being "greater than necessary."

**I.       Sentencing Argument**

In determining the appropriate sentence in this case, the Court must consider: (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence to reflect the seriousness of the offense, (4) promote respect for the law, (5) provide just punishment for the offense, (6) afford adequate deterrence to criminal conduct, (7) protect the public from future crimes of the defendant, (8) provide the defendant with reasonable rehabilitative opportunities, (9) the kinds of sentences available, (10) the guideline range, (11) the

1

need to avoid unwanted sentencing disparities, and (12) the need for restitution. *See* 18 U.S.C. § 3553(a). The advisory guidelines are but one of the relevant considerations at sentencing and the Court cannot presume the reasonableness of the applicable advisory range. *Gall v. United States*, 552 U.S. 38, 50 (2007). In Mr. Elamin's case, the advisory range recommends a sentence that is less than the mandatory minimum.

Mr. Elamin's request to impose the statutory minimum sentence of ten years of incarceration followed by a period of supervision is justified by the factors discussed below.

### A. Nature and Circumstances of the Offense

Mr. Elamin is before the Court to be sentenced for Attempted Coercion and Enticement of a Minor in violation of 18 U.S.C. § 2422(b). He has admitted to the facts contained in paragraph 11 of the PSR, along with the offense conduct set forth, and takes full responsibility for his conduct. *See* PSR ¶¶ 11-19, 68-70.[1] He knows his life will be irrevocably impacted because of his conduct and understands that serious consequences are appropriate.

Between March 19 and March 23, 2024, Mr. Elamin engaged in discussions with undercover law enforcement agents, one of whom he believed to be 13 years of age. There were several age-inappropriate discussions, along with photos exchanged, including one of Mr. Elamin in his military uniform. On April 2, 2024, Mr. Elamin was arrested, waived his *Miranda* rights, and was incredibly forthcoming throughout his interview. Mr. Elamin has been in federal custody since April 2, 2024.

A federal grand jury returned a three-count indictment against Mr. Elamin on April 18, 2024, after the filing of a Criminal Complaint and Affidavit. Following his initial appearance and

---

[1] Paragraph 68 references the actual abuse of a child, which Mr. Elamin denies. He states that such talk was fantasy only.

the completion of the discovery process, Mr. Elamin entered a guilty plea to Count One of the Indictment on June 12, 2024, before this Court.

When he participated in his PSR interview, Mr. Elamin again expressed remorse for his actions. PSR ¶ 24.

### B.  Mr. Elamin's History and Characteristics

Mr. Elamin was born Zhane McIntosh, a name he voluntarily relinquished when he was 7 years old. His parents, Ronald Tavern, and Tiffany McIntosh, were drug addicted and homeless, and he recalls experiencing a lack of food and moving from "couch to couch." PSR ¶ 42. Eventually, his mother abandoned him into the care of his maternal grandmother. If his mother ever visited, she was "high on drugs." PSR ¶ 43.

But even at his grandmother's home, Zhane was not safe. Until the age of 5, his grandmother sexually abused him and allowed a friend of hers to do the same. PSR ¶ 43. Too early in his life, Zhane learned about sex through his victimization. And now, when he thinks back on his offense and reads descriptions of the conduct that led him here, he has enough insight to see that his own words in those communications reflected what he heard in his own childhood.

Through some family connections, Ms. Ummilkhair Elamin, already the mother of 6 children, took Zhane in at the age of 5. By the age of 7, Zhane McIntosh became Zhane Elamin. PSR ¶ 42. The transition to a "normal" home was not easy, and Mr. Elamin recalls hoarding food, especially fearful about access to food with so many people in the home. PSR ¶ 46. In his teenage years, Mr. Elamin was diagnosed with Post-Traumatic Stress Disorder due to his early childhood. PSR ¶ 54. He understands that, along with any other treatment he receives, he must also confront his childhood trauma.

After retiring as a teacher from the Los Angeles Unified School District, Ms. Elamin began to home school Mr. Elamin and other children in the area under the City of Angels Independent Study Program. Under her tutelage, Mr. Elamin gained a love of reading and writing, something he maintains to this day.[2] PSR ¶¶ 47, 56.

Mr. Elamin's adopted family is close knit. Being the youngest of many siblings, he feels incredibly fortunate. His mother raised all of her children, including him, in the Muslim faith. The teachings of Islam played a strong role in everyday life growing up, including participation at a mosque, and giving back to the community. Mr. Elamin feels that he has brought shame to his family and his faith. In an early life characterized by lacking physical things, Mr. Elamin's most prized possession was his prayer rug, gifted to him around the age of 8 by his mother. Upon his arrest the prayer rug was missing, and he believes this is a reflection of losing his way. Since his incarceration, Mr. Elamin started praying again.

Immediately before Christmas 2023, Mr. Elamin married Lina Zaid during his deployment in Virginia. Unfortunately, Mr. Elamin now states that marrying at such a young age was not a wise decision, even though the couple has known each other for most of their lives. He remains uncertain if the relationship will end, or if there is still a chance for reconciliation.

**C. Need for Sentence to Reflect the Seriousness of the Offense, Promote Respect for the law, and Provide Just Punishment, Deterrence and Rehabilitation**

1.  Seriousness of the Offense; Respect for the Law; Just Punishment

Mr. Elamin has expressed remorse and accepted responsibility for his criminal conduct. This reflects his respect for the law and willingness to accept the consequences of his actions. He

---

[2] Mr. Elamin is in the middle of writing a book that is a mix of historical fiction and fantasy. He hopes to publish it in prison. Any proceeds he might receive would go toward restitution for his victims.

knows this Court will impose just punishment in the form of at least ten years in prison, as the law requires. Mr. Elamin has a criminal history score of zero, which yields a criminal history category of I.

Mr. Elamin has been a generally law-abiding citizen. For the most part, he has been compliant with authority, and he seems capable of living a productive life in the future. This conclusion is further supported by his military history. The offense and his impending term of imprisonment have turned his life, and his family's, upside down. He is aware of the harm he has caused, and it weighs on him constantly. A ten-year term of imprisonment is a *lengthy* sentence for anyone. It is especially lengthy for someone like Mr. Elamin who is only 21 years old, representing nearing half of his life so far. Mr. Elamin has never been incarcerated; he will emerge from prison a very different person. The requested sentence is more than sufficient to promote respect for the law and justly punish Mr. Elamin. It also adequately reflects the seriousness of his offense conduct.

2. Adequate Deterrence; Training and Rehabilitation

The requested sentence of ten years will provide adequate deterrence. Beyond Mr. Elamin's age upon release,[3] his desire and ability to participate in rehabilitative programming and treatment indicate that he is not likely to reoffend. Indeed, it is evidence that Mr. Elamin is taking proactive steps to change course; this offense has brought to light his need for particular types of treatment.

---

[3] *See* Roger Pryzbylski *et al.*, *The Impact of Long Sentences on Public Safety: A Complex Relationship*, 36 Fed. Sent'g Rep. 81, 83 (2023) (discussing findings that people are most likely to engage in criminal behavior during youth, but their proclivity to engage in such behavior decreases as they age).

Furthermore, the fact that Mr. Elamin has no criminal history points and is in criminal history category I indicates he presents a substantially reduced risk of recidivism. *See* United States Sentencing Commission, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 14 (March 2017) ("Overall, an offender's total criminal history score is a strong predictor of recidivism. Rearrest rates range from a low of 30.2 percent of offenders with zero criminal history points to a high of 85.7 percent for offenders with 15 or more criminal history points."). In addition, his recidivism risk is further ameliorated because of his healthy support network and supportive family.

Lastly, scholarly literature and research on deterrence further support the requested sentence of ten years. Research indicates that increases in the *severity* of punishment are far less important to producing deterrent effects than the *certainty* of punishment (if severity is relevant at all). *See* Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, 1. Virtually no empirical data suggests that harsher (*i.e.*, lengthier) sentences achieve better general deterrence than moderate sentences. *See* Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143, 187 (2003). Indeed, "[t]he findings regarding general deterrence are relatively settled":

> The existing data show that in the absence of the threat of punishment for criminal conduct, the social fabric of society would readily dissipate; crime would escalate and overwhelmingly frustrate the capacity of people to lead happy and fulfilled lives. Thus, general deterrence works in the absolute sense: there is *a connection* between criminal sanctions and criminal conduct. However, there is insufficient evidence to support a direct correlation between higher penalties and a reduction in the crime rate. . . . It is counter-intuitive to suggest that higher penalties will not reduce the crime rate. However, the evidence is relatively definitive.

Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted). In sum, "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime." *Id.* at 1203.

For these reasons, the requested term of incarceration is more than adequate to provide deterrence and achieve the other goals set forth in 18 U.S.C. § 3553(a)(2).

3.  Collateral Consequences

As a result of this conviction, Mr. Elamin will be separated from the United States Navy, an abrupt end to the path he hoped to pursue for the rest of his life. He will lose several benefits due to his behavior, including but not limited to: (1) the GI Bill, allowing for further education, (2) lifetime medical care through the Veterans Administration, (3) housing benefits, and (4) health and housing insurance benefits.

Perhaps most importantly, he will be branded publicly as a sex offender, a status that will place him at the margins of society for the rest of his life. *See Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a [person] as a sex offender."); *see also Smith v. Doe*, 538 U.S. 84, 115 (2003) (Ginsburg, J., *dissenting*) (describing the "profound humiliation and community-wide ostracism" that attends sex offender community notification). The First Circuit in *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), aptly noted that "[s]ometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed." And the stigma of a felony conviction – and particularly a conviction for a sex offense – is more intrusive and pervasive today than ever before due to the availability of information on the internet. *See generally* Wayne A. Logan, *Informal*

7

*Collateral Consequences*, 88 Washington L. Rev. 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave."). Mr. Elamin will carry the stigma and suffer the consequences of this conviction for the rest of his life.

Mr. Elamin has already experienced the stigma of a sex offender firsthand, having been brutally attacked while at Western Tidewater Regional Jail by other inmates. Prior to being placed in an offense-specific pod, the jail placed Mr. Elamin in general population. A small, slender young man, Mr. Elamin was no match for his multiple attackers, who beat him so badly that he was sent to the emergency room. PSR ¶ 52. Mr. Elamin still wears his broken glasses following the assault, kept together by tape. Mr. Elamin is grateful to the United States Marshals who have been very responsive in getting Mr. Elamin to an ophthalmologist. Mr. Elamin hopes to receive new glasses once he gets to the Bureau of Prisons.

Courts have considered collateral consequences, like the loss of a career, mitigating. *See, e.g.*, *United States v. Stone*, 374 F.Supp.2d 983 (D.N.M. 2005) (imposing below-guideline sentence on defendant convicted of aggravated sexual abuse in part because defendant "suffered a lot as a result of his crime," including being terminated from his job and divorced by his wife; his sentence of incarceration "coupled with Stone's personal losses, reflects the seriousness of his offense, promotes respect for the law, and provides just punishment"); *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (affirming below guideline sentence for child pornography defendant based in part on fact that defendant "lost his teaching certificate and state pension as a result of his conduct. Consideration of these facts is consistent with § 3553(a)'s directive that the sentence reflects the need for 'just punishment' and 'adequate deterrence'") (citing 18 U.S.C. § 3553(a)(2)(A) & (B)); *United States v. Samaras*, 390 F. Supp. 2d 805 (E.D. Wis. 2005) (imposing below guideline sentence, in part, because "as a consequence of his conviction and

sentence, defendant lost a good public sector job, another factor not supported by the guidelines"); *see also United States v. Wachowiak*, 412 F. Supp. 2d 958 (E.D. Wis. 2006) (noting that "the guidelines failed to account for the significant collateral consequences defendant suffered as a result of his conviction," which included that "he was compelled to resign as piano teacher of children and as a church musician" and that "[h[is future career as a teacher was ruined").

Moreover, Mr. Elamin will be subject to a registration requirement, which is a particularly oppressive collateral consequence. *See, e.g.*, *United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004) ("[T]here is more to the concept of just punishment and deterrence of the particular individual than the temporal and physical hardships imposed by a sentence as measured by the length of time in prison pre-specified by a guidelines range. In fact, beyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement . . . ."). His offense of conviction carries an inescapable stigma. *See, e.g.*, *United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) (affirming on plain error review district court's finding that the collateral consequences of defendant's child pornography conviction should factor into its analysis of what constitutes "just punishment," including "the interruption of defendant's education and employment, the dissolution of his engagement, *and the stigma attached to this specific offense*") (emphasis added).

For the reasons stated above, a sentence of one hundred (120) months of incarceration would sufficiently accomplish retributive, rehabilitative, and deterrence goals, and anything longer would be unnecessary.

4.    <u>Additional Sentencing Considerations</u>

Mr. Elamin's youth and childhood circumstances have been some of the drivers of his poor decision-making. At the time he committed the instant offense, he was barely old enough to legally buy alcohol. Yet he had already volunteered to serve his country, trying to find a better path. Sadly, he still struggled with the demons of his victimization. His actions cannot be viewed in isolation or in a vacuum, but instead, in the context of his youth and early childhood trauma.

When considering a sentence that is sufficient, but not greater than necessary, Mr. Elamin requests that this Court consider the newly amended language in U.S.S.G. § 5H.1 that will become effective on November 1, 2024. These changes to the guidelines are rooted in science. The Commission's published reasoning behind the Amendment reflects society's "advancement in knowledge of human behavior as it relates to the criminal justice process" and the "evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability." *See* www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_2024-youthful.pdf (internal citations removed). Further "[t]he amendment also reflects expert testimony to the Commission indicating that certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate interventions, may promote desistance from crime." *Id.*

Young brains, like Mr. Elamin's, are highly susceptible to the allure of rewards, yet they are not developed enough to weigh risks against rewards. *See* Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 5 Ann. Rev. Clinical Psychol. 459, 469-70 (2009). Teenagers and young people in their early twenties also "do not possess the impulse control of an adult so they tend to engage in high-risk, reward-seeking decision making." B.J. Casey *et al.*, *The*

*Adolescent Brain*, 28 Developmental Rev. 62, 70 (2008). Brain scanning technology reveals that brain functions related to decision-making are not fully mature until adulthood, with development continuing "into at least the third decade of life." Staci A. Gruber & Deborah A. Yurgelun-Todd, *Neurobiology, and the Law: A Role in Juvenile Justice?*, 3 Ohio St. J. Crim. L. 321, 324 (2006).

Given Mr. Elamin's youth now, and at the time of the offense, he asks the Court to take that into consideration when fashioning a sentence in accordance with the mandate of 18 U.S.C. § 3553(a). Mr. Elamin entered federal custody a young military member; he will leave prison a sex offender and a felon accustomed to life in federal prison. A sentence beyond what the parties have agreed to will make it much harder for him to become the person he is capable of being. He needs trauma-informed mental health treatment, job skills, and a plan to pay his restitution. For a person as young as he is, 10 years is more than enough.

## CONCLUSION

For the foregoing reasons, Mr. Elamin respectfully requests a sentence of one hundred twenty (120) months of incarceration. Such a sentence is sufficient, but not greater than necessary, to accomplish the goals set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

ZHANE TAVERN ELAMIN

By:_____/s/_____
Suzanne V. Suher Katchmar
Virginia State Bar No. 37387
Attorney for Zhane Tavern Elamin
Assistant Federal Public Defender
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: (757) 457-0890
Facsimile: (757) 457-0880
suzanne_katchmar@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of October 2024, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Kristin S. Taylor
Assistant United States Attorney
Office of the United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virgina 23510
kristin.taylor2@usdoj.gov

Jeremy McKinnon
Special Assistant United States Attorney
Office of the United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virgina 23510
jeremy.mckinnon@usdoj.gov

I FURTHER CERTIFY that I will send by electronic mail the foregoing document to the following non-filing user:

Samantha Bean
United States Probation Officer
United States Probation Office
600 Granby Street, Suite 230
Norfolk, Virginia 23510

_____/s/_____
Suzanne V. Suher Katchmar
Virginia State Bar No. 37387
Attorney for Zhane Tavern Elamin
Assistant Federal Public Defender
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: (757) 457-089
Facsimile: (757) 457-0880
suzanne_katchmar@fd.org